**UNITED STATES of America**

v.

**INTERSTATE ENGINEERING COR-
PORATION et al.**

Crim. No. 6773.

United States District Court
D. New Hampshire.

July 20, 1967.

WYZANSKI, Chief Judge.

### CHARGE TO THE JURY

Mr. Foreman and members of the jury, we have reached what yesterday Mr. Phinney referred to as the penultimate stage of the case. I do not know whether he intended a pun implying that I would write out my Charge. In any event, my Charge is oral and not written, for though I realize how difficult some aspects of this case are my principal object is to talk to you so that you may clearly understand your obligations and the applicable rules of law.

If at any stage you have thought that I have expressed an opinion upon the facts in this case or upon how you should decide this case I assure you you have misunderstood my intention. Neither previously, nor now, nor hereafter do I intend in any way to indicate how you should decide this case.

This has been a very long case. We began a month ago yesterday and this is our 17th day. It is not the longest case that I have ever tried. One ran for five years but fortunately did not involve a Jury. Nonetheless, I am aware that it has been a considerable burden upon you as well as upon the parties and their counsel, and also upon the court reporter, the clerk and many other people in attendance here during this summer session. But the case is one of very great importance. In a real sense every case is important to the parties, and a criminal case is particularly important because, as was pointed out to you in argument, there are at stake precious interests, such as possibly the liberty of the persons involved, and certainly their honor, reputation and pride, and also there is the great interest of the society, of the United States of America and of the people in having justice administered equally and fairly.

Now my Charge is necessarily going to be a long one. It won't be as long as one that I heard a month ago in England. After 42 days of trial Mr. Justice Lawton delivered, as they call it, a summing up, which lasted three days. I hope that mine won't take three hours. However, I have received perfectly properly voluminous requests for instructions, and I want to cover at least in substance most of the principal points that counsel were good enough to draw to my attention and such additional points as have occurred to me.

I am sure that you have felt, as I have, that counsel on all sides have demonstrated great skill and ability, and that their experience and judgment have been of considerable assistance to you as well as to me in bringing this case to this point.

My Charge, I said, will be long, and because it will be long I am going to do a rather unusual thing at the outset by telling you to pay particular attention whenever I talk about the burden of proof, that is the obligation of

the Government to prove its case beyond a reasonable doubt as to every essential element, and I want you to note the emphasis that I place upon the three-branched aspects of this case. With respect to the duty of the Government to prove beyond a reasonable doubt with respect to a defendant, before that defendant can be convicted, that he personally, or, in the case of a corporation, an authorized individual acting for the corporation, was a party to a scheme to defraud, that he or the authorized corporate officer or representative personally specifically intended that the mails should be used in connection with that scheme and, third, that he, or in the case of a corporation, the authorized corporate representative specifically intended to defraud, that is to act in a wicked manner.

Now I will say a great deal more about each of those branches of the case but what I have said initially is intended in a way as a sort of headnote or set of red markers so that you will pay particular attention to what seems to me the outstanding aspects of the questions which will come before you.

In a trial of this kind the Judge gives instructions with respect to the law. You are required to follow what the Judge says is the law. A Judge, not least this Judge, makes mistakes with respect to the law. But whenever a Judge makes a mistake with respect to the law, those who believe he has made a mistake among the lawyers at the table have a right to call it to his attention, and if he doesn't correct the mistake they have a right of appeal to the Court of Appeals for the First Circuit, sitting in Boston, and in some appropriate cases ultimately to the Supreme Court of the United States, but you are not to correct any error I make with regard to the law.

The law assumes that you are at least as likely to be mistaken with respect to any attempted correction of law as you are likely to be right and, moreover, we could not tell if you were making an error of law because you would not be making it on the record the way I am at every moment.

You are the judges of the facts in the case and that is a sufficiently burdensome duty. That is to say, it is you, not the Judge and not the lawyers, who are to make up your mind what was the evidence, how much of it was credible, that is to say believable, and it is up to you to determine ultimate questions and preliminary questions of fact.

Anything that counsel have said or anything that I have said or may say about the facts you are entirely free to disregard. I told you the other day how impressed I was by a statement made by Mr. Justice Lawton, when he was addressing a Jury and reminding them that on questions of facts they were not in any way to defer to a Judge merely because the Jury thought a Judge had more experience and therefore might be a wiser fellow with respect to the facts.

There is no reason to believe that a Judge is a wiser man with respect to facts than a juror, and there are many reasons to believe that one Judge is less wise than 12 jurors. 12 jurors represent different points of view. They have different backgrounds. And particularly, let me say, in a case where there is an out-of-state Judge presiding over a Jury drawn from what is called the vicinage, the neighborhood, the Jury is in a much better position than the Judge to determine the credibility of the local witnesses and indeed to form opinions with respect to questions of fact of every kind.

Another famous English Judge, not Mr. Justice Lawton, but Lord Devlin, has said that a Jury is a parliament, a little parliament or Congress. Now if that phrase means that the Jury is representative of the community in formulating standards, there is a great deal of truth in that. Of course, the Jury is not to formulate standards contrary to the written law or the common law. But within certain areas, and particular-

ly, I am inclined to say in the area of determining whether conduct is fraudulent or not, the Jury is a small legislative body.

■ But let me warn you that in formulating your views of the facts you are not to bring to bear anything except the evidence you have heard in this and the earlier courtroom. You are not to take into account any gossip, if you have heard any, about this company, or these companies, or these defendants, individual or otherwise.

You are to ignore anything you may have seen in the newspapers, or on television, or heard on the radio, or in any way learned about except what you learned here in court.

■ It would be very improper for you to approach this case upon the basis of some political philosophy, such as that you think that advertising is the catalyst which makes the capitalist system run, or, on the contrary, advertising is a wicked waste of money and people ought to be allowed to purchase in privacy without the intrusion of salesmen. Either kind of philosophy, or any other kind of philosophy which represents your personal economic and political and social views is out of place.

Your function here is to consider the facts as developed here in the light of the instructions of law that I give you.

Now you know very well that this criminal case began with an indictment returned by the Grand Jury. The Bill of Rights provides that no one in a Federal Court can be charged with a serious crime unless the matter is first presented for consideration by a Grand Jury. Grand is a French word "Grande," and means a jury of 23, or not less than 16, in any event.

Now the Grand Jury presumably heard only the evidence which the Government saw fit to offer to the Grand Jury. So far as we know, the usual practice was followed, and the only persons who ever talked to the Grand Jury were the United States Attorney and his assistants and some witnesses that the United States Attorney and his assistants suggested that the Grand Jury should listen to.

■ The Grand Jury, so far as we know, never heard any of the defendants nor any of their witnesses, and assuredly none of their counsel. All that the Grand Jury did was to come to a conclusion that there was a case which they thought worth listening to, and they made a charge, and that charge is called an indictment.

■ But the charge is not evidence. It is merely a framework of a complaint, and in this particular case large parts of the indictment have been struck by me even before you were called to hear this case, and I am going to tell you that other parts of the indictment have turned out to be immaterial, or irrelevant, or otherwise not for your consideration. But let me again state most emphatically that the indictment in whole or in part is not evidence. It is a mere complaint or charge.

■ In this case, as you well know, there remain for trial five individual defendants and two corporations. Each of them is a separate person, the corporations being persons in contemplation of law, and as to each person you are to give separate verdicts, and with respect to each you are to examine most carefully the evidence on an individual basis, and this is of the greatest significance because here in every aspect personal intent is a fundamental issue.

■ Now this being a criminal case the defendants, and each defendant, enters the courtroom with the benefit of the presumption of innocence. That presumption continues throughout the case. It is the Government that has the burden of proof. It has the burden of proof on each issue, and the burden of proof is proof beyond a reasonable doubt. That means that you must be persuaded to a moral certainty. It means you must be persuaded as you would want to be persuaded about the most important concerns of your life.

After all, as I already pointed out to you, possibly the liberty, and certainly the honor, reputation and pride of these defendants are at stake here, and with respect to their vital interests, as well as society's vital interests, in order, in integrity and in justice, it is most important that you should apply the rule that the Government must persuade you beyond a reasonable doubt with respect to every essential element of the charged crime.

Now note I said "every essential element." There are certain aspects of the indictment which are not essential. I have struck some of them and others I am going to point out to you are not essential.

■ Without covering the whole ground, let me say that the essential elements could be reduced to three with respect to each defendant: Was he a party to a scheme to defraud? Did he have the specific intention to use or have someone else use the mails in connection with that scheme? And, third, did he have the specific intention to defraud, that is to do wrong?

Now you notice I am repeating that three-branched formula. I am going to do it several times. More than 30 years ago, when I was in Illinois, on an occasion I saw a poster on a wall, something that Abraham Lincoln is alleged to have said, and I don't know that he did say it, about talking to a Jury. He said, "If it is important, tell it to them three times." I shall tell it to you at least three times.

■ Now I have said that the Government has the burden of proof beyond a reasonable doubt, and there is something which, as it were, is a corollary to that. No defendant has the duty to take the stand or to offer any evidence. You must never hold it against a defendant in any way, directly or indirectly, that he or it did not take the stand directly or through a representative. In this particular case, as you will remember, the California corporation, Interstate Engineering Corporation, did not have any witness take the stand on its behalf. But that is not to be held in any way against the California corporation because the California corporation has the right to say, "The Constitution of the United States protects me," or "protects the corporation" in the sense that it is the Government that has the burden of proof beyond a reasonable doubt.

There is a slang phrase which summarizes the position which a defendant who does not take the stand is entitled to take. The defendant is entitled to say, "So what?"

■ In other words, it is the Government that has to prove it beyond a reasonable doubt, and the defendant may keep quiet, and that silence is in no way to be used against the defendant. It is not a direct or implied concession. It is merely a reliance upon the Constitutional right to wait until the Government offers something which seems to the defendant to be of any consequence.

Much may be offered by the Government to which a defendant says, "So what?" It is up to the Jury to decide whether the evidence offered in this case satisfies the Government's duty to persuade you beyond a reasonable doubt.

Now I have made a little reference already, and I am going to make more, to the indictment even in its truncated or cut-off form. You will remember that on the 19th of June the Government's Bill of Particulars was shown to you. The Court made some suggestions prior to trial. The defendants moved in accordance with those suggestions that the Government should render certain particulars, and the Court ordered the particulars, and pursuant to that order on July 19th the Government filed the Bill of Particulars.

■ Now the Bill of Particulars cannot enlarge the indictment. It cannot add to it. It cannot vary the theory set forth in the indictment. All that it can do is hopefully pinpoint to some

extent aspects of what has heretofore been charged by the Grand Jury.

 The United States Attorney has no authority to add to the indictment, and he has no authority to change a theory in the indictment. An indictment may have a number of different theories in it, and I regret to say that the indictment which was originally drawn certainly seemed to have something wanting in absolute clarity.

At any rate, whatever may be said about the indictment as a whole and as originally drawn, I hope that when I get through you will have what I think is the original purpose of the Grand Jury clearly brought out in this Charge without any suggestion by me, directly or indirectly, that the Grand Jury was right or that you ought to return verdicts of guilty. I make no such suggestion. I am merely trying to clear the way so that you can reach whatever verdicts you as jurors deem to be correct.

Now you will notice that at the end of the Government's case I finally entered a judgment of acquittal with respect to one corporation, the National Budget Corporation, that I entered judgments of acquittal with respect to the California corporation on all counts except Count 35, and left that for you, and you will realize that I with respect to the New Hampshire defendants entered judgments of acquittal with respect to two counts, but left Counts 1, 23, 27 and 35.

Each count is a separate charge. That is to say, it is the charge of a different crime. Now you may think this is rather funny because you may look upon these counts as being just duplications.

 The Federal Mail Fraud Statute, as I shall tell you a little more about later, treats as the wrong condemned by the statute the mailing pursuant to a scheme to defraud and pursuant to an intent to use the mails and pursuant to an intent to do wrong, but each separate mailing is a different crime under the statute if the three-pronged conditions have been met, to wit, proof beyond a reasonable doubt of a scheme to defraud, a specific intent to use and use of the mails, and a specific intent to do wrong and commit a fraud.

That does not mean, Mr. Foreman and members of the Jury, that a Judge will necessarily impose cumulative sentences, if you as jurors should by any chance convict a defendant of more than one count.

 Sentencing under the Federal system, with negligible exceptions, is a function of the Judge and not the Jury, and the Judge, after he has considered the verdicts, if he finds that there are verdicts of guilty, may use his discretion—that is his judicial discretion, not his arbitrary whim—as to whether to pile one sentence on top of another or to have concurrent instead of cumulative sentences. In any event, the problem of sentencing is not for you.

Now you will notice that in this particular case the California corporation, Interstate Engineering Corporation, has had two very able counsel who have spoken up, as well as two other counsel who have not spoken up, or not often, that is to say, Mr. Phinney and Mr. Call, and Mr. Kelly and Mr. Gute. The New Hampshire defendants, that is to say the remaining corporate defendant in this case, that is, New England Enterprises, Inc., and the corporation which has been acquitted, National Budget Corporation, and the five individual New Hampshire defendants have had as their counsel Mr. Brown and Mr. DeGrampre.

Now you may think that the multiplicity of counsel for one corporation against the relatively small number of counsel for all the New Hampshire defendants is strange, but the New Hampshire defendants have chosen to have Mr. Brown and Mr. DeGrampre speak for all of them. They may on the basis of their long-time familiarity with Mr. Brown have decided that he is the best lawyer they could get, and even if they could only have part of him they would rather have part of him than anybody

else. They may have decided for reasons of economy. They may have decided for reasons of convenience of presentation.

All that I say to you is that whatever their reasons were, the fact that they have had a common counsel does not mean that you are to treat them as being one. Each individual defendant and New England Enterprises, Inc. are entitled to be separately considered, and nobody would feel this more strongly than Mr. Brown and Mr. DeGrampre, who represent all of them.

Now I have told you most of the general things that I ought to say with respect to the preliminary matters, but there are a few others as to which I want to give you instruction because this is, after all, the first case at this session of Court at which any of you have served as a juror, and perhaps some of you have never served as a juror in any case, and in spite of the excellent handbook which was given to you I assume that like myself you are not injured by listening orally to what you already read.

Now in this case, as you know, there remain for your consideration the New Hampshire corporation, New England Enterprises, Inc., and the California corporation, Interstate Engineering Corporation, as well as five individuals. Now those two corporations not only in the words of the street "have no soul" but in the words of an ordinary observation "have no body," but I am not suggesting that you will treat them with any greater severity or kindness on that count. I am merely pointing out to you that they cannot appear except through living human beings. In the case of a corporation, a corporation can be represented and is represented by anybody who has adequate authority based upon the law of the State in which the corporation is organized and the by-laws of the corporation to speak for that corporation. There is no doubt, for example, that the President of a corporation can speak for the corporation in regard to almost everything, not quite everything but almost everything. There

is no doubt that a person who is a Director of Sales of a corporation has authority to speak in connection with sales matters for a corporation. And so far as salesmen are concerned, their authority to speak depends upon the extent to which they are authorized to talk.

Now, for example, a salesman of a corporation who engages in sales talk is acting within the scope of his authority. If he is foolish enough to talk about the financial affairs of the corporation, and its capacity to lend money, or the like, it is obvious the salesman is outside the field of his authority.

Having said this about corporate agents, I want as a special word of caution to point out to you that this criminal case against the individual defendants does not involve with respect to the individual defendants as distinguished from the corporate defendants any theory of imputed knowledge or anything of that sort. That is to say, when you are considering whether an individual X knows about something, you are to consider whether he personally knows about it, not whether some salesman acting for him knows about it, not whether some associate knows about it. In this kind of criminal case, whatever may be rules of agency in civil matters, individuals are to be judged on the basis of their personalized individual knowledge.

Now there are some problems with respect to the rules of evidence in this case. I have already told you you are the judges of the evidence, but you are the judges of the evidence within certain principles of law. You are to consider only the evidence, as I told you, which you heard and which was offered to you in Exhibit form and which I admitted. You are not to consider any excluded evidence, whether I struck it or whether I didn't admit it. You are not to treat as evidence a question which was put by counsel unless that question produced a response which incorporated as it were the question.

Of course, if a lawyer asked a witness, "Were you in Concord on April 1?" and the witness answered Yes or answered No, you have to take into account the question in understanding the answer. But, on the other hand, if the lawyer says to the witness, "In view of what was said by John Jones at an earlier stage about a contract made on March 1st, 1965, are you of the view that you understood that contract?" and the witness says, "I never heard about the contract," you're not to take into account the question and to assume that there was a contract on March 1st, because the witness' answer does not incorporate the contract.

 Now in certain instances evidence may be admitted only for a particular purpose and not generally. And this is very important because you will remember the Federal Trade Commission Order, Exhibit 32-A, in this case, and you will remember that I instructed you at the time that that Federal Trade Commission Order was admitted, that it was not admitted for and could not be considered by you in connection with the question whether there was any scheme to defraud. It has no bearing upon that issue at all. Only if by evidence independent of Exhibit 32-A you conclude that there was a scheme to defraud and you are then trying to make up your mind whether a particular defendant had the specific intent to defraud somebody you may then take into account that exhibit.

Now I am going to say quite clearly again what I hope I said earlier in the trial, that what was pending before the Federal Trade Commission was not a charge of crime. What was pending before the Federal Trade Commission was a complaint. The complaint may or may not have had any merit. We don't know. All we know is that Interstate Engineering Corporation, as well as some others, consented to the entry of an Order.

Now that doesn't mean that Interstate Engineering Corporation had then vio-lated the Federal Trade Commission Act. It certainly doesn't mean that Interstate Engineering Corporation had then committed a crime. As I said to you earlier, all it means is that to get rid of the case, just as in a plea of no contest, *nolo contendere,* in a traffic court, the California corporation said, "We will abide by the Order that is issued even if we weren't ever guilty of anything."

 Now that Order was an order with respect to future conduct and has to do with whether such future conduct specifically described would constitute what the Federal Trade Commission Act calls an unfair trade practice. Now an unfair trade practice may be or may not be a fraud. The only reason that you are allowed to consider this Federal Trade Commission Order is that if you are trying to make up your mind whether (you already being satisfied that there was a scheme to defraud a particular individual) a defendant had the specific intent knowingly to defraud, you are entitled to take into account everything he knew about questionable conduct. You may think or you may not think that what the Federal Trade Commission ordered as future music set a standard of the difference between fraudulent and nonfraudulent conduct. You may, as you see fit, decide whether this was the kind of red flag, this kind of warning, which would put somebody on notice that a scheme was a fraudulent scheme. There isn't any law that requires you to decide it one way or the other. It is a question of fact. And all that the exhibit was introduced to show was that there was some kind of proceeding which, it is up to you to decide, was or was not a red flag.

 Now I have said to you that there are items of evidence which may be admitted for a particular purpose. There are also items of evidence which may be admitted only against a particular defendant or against some defendants and not against other defendants.

 Now you will bear in mind that repeatedly, over and over again, I

provided that certain evidence was not admitted against the California corporation, Interstate Engineering Corporation. And evidence which was not admitted against that corporation is not to be considered by you in deciding whether it was guilty or not guilty. Likewise, evidence which was offered by the Government in rebuttal of the testimony of the New Hampshire defendants is not to be considered by you in adjudging the guilt or innocence of the California defendant because the California defendant rested at the end of the Government's case, and the evidence offered thereafter by the Government is not admissible against the California corporation.

Now there is some evidence which, you will remember, I did not decide one way or the other as to its admissibility against the California corporation. In particular I expressed myself at length at the time that Exhibit 43 was offered last week, and some of you will perhaps recall the rather elaborate instructions which I gave at that time. I reminded you that against the California corporation I had admitted the documents which originated with that corporation, statements made by Mr. Zobel and Mr. Wolf, who were officers or agents of that corporation, but in general, with those exceptions, I had not admitted anything against the California corporation which took place before the 28th of July, 1965.

Now on the 28th of July, 1965, as you will recall, there was evidence that Mr. Zobel was in New Hampshire, he having come the day previous, and there was evidence, which you are free to believe if you wish, that he talked with at least Mr. McCadden and Mr. Lucht, and he also talked with some people at the Chamber of Commerce, and he made some inquiries as to what were the practices of New England Enterprises, Inc., and he had some contacts of various kinds with Postal Authorities.

Now the question is whether, after he left, after Mr. Zobel left, statements which were made by officers and agents of New England Enterprises, Inc. may

or may not be attributed to the California corporation. This includes statements which were made by New England's officers and employees to Postal Authorities, and this includes the question as to whether items sent by attorney Connor to Postal Authorities and conferences between Mr. Connor and Postal Authorities are admissible as against the California corporation.

Now all of this depends upon a preliminary question of fact which you must settle and I cannot decide. That is, what went on when Mr. Zobel was here? Did he formally or informally agree that in connection with this Postal inquiry there was a common undertaking and a common purpose and a common venture between the California corporation and the New Hampshire corporation and the New Hampshire individuals?

▆ Now if he on behalf of the California corporation did make such an agreement, formally or informally, or enter into such a common venture or plan, and if it was part of that agreement, venture or plan that from time to time there should be contacts between the representatives of New England Enterprises, Inc. and the Postal Authorities, then whatever took place between New England Enterprises, Inc. and the Postal Authorities may be considered by you against the California corporation. You have to be satisfied that there was a common venture. You have to be satisfied that the venture included discussion with the public authorities, and you have to be satisfied that this common venture and purpose continued up to the time that the statement or statements and conduct or acts occurred between New England's representatives and the Postal Authorities.

▆ I have again and again said to you that this is a criminal case in which the Government has the burden of proving its case beyond a reasonable doubt. There is no rule of law that makes the Government have quantitatively the larger share of the evidence. If the Government produced a 15-year old child, whom you believe, and the

defendants produced 12 Bishops, whom you don't believe, under those circumstances you can find that the Government has proved its case beyond a reasonable doubt. That is, there is no business of counting heads or weighing bodies. What you do is decide whether or not on the evidence offered you are persuaded beyond a reasonable doubt.

There is no rule of evidence in this case that leads one to prefer written to oral testimony or oral testimony to written testimony. It's entirely a question for you as to which kind of testimony you in this particular case find to be credible. Sometimes you may think the written testimony is better, sometimes you may think the oral testimony is better, sometimes you may think some mixture is better. It is up to you.

There is no rule of law that you must prefer direct evidence to circumstantial evidence, or circumstantial evidence to direct evidence. A jury can choose. Some jurors may believe that the direct testimony is better than the circumstantial. Some may think that the circumstantial evidence is better. Some may form their opinion by a combination. It is entirely a jury question.

It is not true that a jury must exclude the testimony of somebody who has told a lie. You may think, if you want to, that a person who is false in one respect is false in all, or you may, on the contrary, say a person is false in one respect but believable in others. It is just a question of your own common sense applied to the particular testimony which is offered.

Now there is no rule of law that you must believe or disbelieve a biased or friendly or hostile witness. It's up to you. Of course, I assume that anybody will take into account whether a person is subject to a bias, whether he has a motive to tell the truth, or a motive to lie. But many people who have a motive to lie tell the truth, and many people who are subject to a bias of interest are nonetheless able to overcome their bias. I rather think that the whole judge

and jury system proceeds on the notion that men are able to transcend to overcome their bias.

Mr. Justice Brandeis, when he was a lawyer, in appearing before the Interstate Commerce Commission said something which I have always treasured, and which I have often quoted as an aid to juries, but this is Mr. Brandeis speaking as a lawyer, not as a Justice, and is in no sense binding upon any of you or upon me. Mr. Brandeis said that if he wanted to think about whether to believe a witness he would inquire as to, first, what were his opportunities for observation? Second, what was his capacity for recollection? Third, what was his capacity for narration, for telling the story afterwards? And, fourth, and in Mr. Brandeis' opinion most important, what was the witness' ability to understand the relation of his particular piece of testimony to the case as a whole?

I would like to add a fifth, although it is a little presumptuous to add anything to what Mr. Brandeis said. I think it is very important to inquire as to motivation or bias, and to see whether the witness has really shown the capacity to overcome the kind of bias that unfortunately every human being is subject to, some more, some less.

Now in this case, as you know from what I have said, and indeed from what was argued to you by counsel, one of the most important questions, Mr. Brown said the most important question, and I am not inclined to disagree with him, is what was the intent of the various individuals and of the corporations as expressed through their representatives? Mr. Wall said to you, "There are no photographs of intent." That was a pretty good statement. But how are you going to judge intent?

In the Middle Ages a judge, speaking as of the state of knowledge of that date, said, "The devil himself knoweth not the mind of man" to which a very witty Nineteenth Century Judge, Lord Bowen, answered, "A man's state of mind is as much a fact as the state of his

**416**

digestion and you tell it in the same way—by the way he acts."

Well, there are all kinds of ways of coming to a conclusion with respect to a man's intent. You every day in your ordinary lives judge the intent of people by the way they act. You know perfectly well that if you are struck a blow, if you're hit by somebody, you come to some kind of conclusion as to whether he did it intentionally or accidentally. Sometimes, of course, he makes a statement which helps you, but sometimes there is enough in his appearance to let you know whether it was a blow in anger or by accident, and sometimes the prior relations between the two of you give you a sufficient clue.

There are many circumstances which enable one to arrive at a conclusion with respect to intent, and in a case of this sort there has been furnished to you a great deal of information with respect to intent.

█ I must now deal with a particular problem in connection with intent, and that has to do with a defendant or other person who acts upon the advice of counsel. Now if an individual having at his command all the relevant facts before taking any action places all the relevant facts before a competent attorney whom he believes to act in good faith and asks that attorney his opinion, and that attorney having considered all the relevant facts, and speaking in advance of any action taken, indicates that the conduct is lawful, under such circumstances you cannot find that the client has knowingly, intentionally violated the law, if he acts in accordance with expert counsel, chosen in a disinterested and honest way, and acting, so far as the client knows, in a disinterested and honest way.

[46] Now it may happen that the client consults his lawyer mid-way in the course of his action. If he consults him mid-way, anything which is done pursuant to the advice of counsel after the consultation also is conduct as to which one cannot say that the client has

acted in a fraudulent or dishonest or knowingly and intentionally unlawful way. But, of course, everything depends on whether there has been placed before the lawyer everything which is relevant and whether the lawyer has been selected in an honest and disinterested way, and whether, so far as the client knows, the lawyer has acted in an honest and disinterested way.

You do not as a client get an immunity bath by going around and talking to a lawyer. You have to tell the lawyer everything you know that is relevant. You have to have selected your lawyer honestly and, so far as you know, the lawyer has to be acting honestly, and the opinion he gives you will protect you with respect to what you do afterwards. He isn't a Court giving a judgment with respect to what you did before. He can't give you a retroactive bath of immunity.

█ And in this situation you the jury are entitled to take into account in connection with the defendants the degree to which they did or did not lay their knowledge before a lawyer in advance of some or all of their conduct, and the degree to which they made a selection with integrity, and the degree to which they had a right to assume that the lawyer was acting with integrity.

I am sure that you will have in mind, without my specifically calling it to your attention, that the New Hampshire defendants had as their counsel, at least at some stages of this matter, Mr. Connor, and you will bear in mind what the testimony was with respect to what was laid before Mr. Connor and what opinions he gave.

I think it only fair for me to point out to you that Mr. Connor for a considerable period of time had been representing the New Hampshire defendants with respect to litigation, and that he had represented them in the New Hampshire State Courts, and he undoubtedly had been giving advice of some kind to the defendants for a very long period of time.

We also know that in October of 1965, if not earlier, and it is up to you, he, as he said, took into account the Federal Trade Commission Order, Exhibit 32-A, and he took into account the State Court proceedings, and he took into account certain State Lottery and other Statutes. It does not appear from what he said, if I remember correctly, but you can correct my memory, you are not bound by what I remember of the evidence, if I remember correctly he did not take into account the statute, 18 United States Code, Section 1341, the Mail Fraud Statute under which this Indictment in this case has been laid.

I think it might be a good idea if I give you a recess for about 10 minutes.

(Recess.)

Mr. Foreman and members of the Jury, you will remember that before the recess I was talking about the application of the principle of consultation of counsel, and I referred specifically to Interstate—sorry—to New England Enterprises, Inc. and the New Hampshire individual defendants having as their counsel at an early stage Mr. Connor. I did not refer, and I really should refer, to the fact that Interstate Engineering Corporation, the California corporation, has had as counsel at all stages, so far as I know, Mr. Gute, who is a partner of Mr. Call and who has been in the courtroom, as you know, and Mr. Gute was consulted by Interstate Engineering Corporation, the California corporation, with respect to certain matters, and you are to apply in connection with that consultation the same kind of principles that I already indicated with respect to an attorney-client relationship and its bearing upon the issue of intent and guilty participation or not guilty participation.

I do think that this would be a very good time for me to underline the fact that I instruct you as a matter of law that the documents which were prepared by Interstate Engineering Corporation, the kind of documents which you will find in this folder, Exhibit 2, and which include the Compact Owner—

Recommendation Program, the Explanation of the Compact Owner-Recommendation Program, the form of Conditional Sales Contract and the form of Promissory Note on the same sheet, and the forms in general which originated with the California corporation are in no sense fraudulent and do not constitute misrepresentations and could not in themselves, no matter what the indictment says, be taken as the basis of a conviction. In other words, insofar as Mr. Gute may have advised his clients to that effect, I agree with him on that point and instruct you so as a matter of law.

You are well aware that this is an action which is brought under the Mail Fraud Statute. You have had it before you as an exhibit, but I see no reason why I shouldn't follow the usual practice of reading it to you, so far as it is pertinent, and I will omit the penalty part because I already told you that is none of your concern.

The statute, 18 United States Code, Section 1341, reads as follows:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be" punished as the statute provides, subject to the discretion of the Judge.

418

Now earlier I made it quite plain that so far as you are concerned the three essential elements in the statute which the Government must prove beyond a reasonable doubt with respect to any defendant before you can convict that defendant are, first, that there was a scheme to defraud in which the particular defendant participated; second, that the mail was used and there was a specific intent in the plan that the mail should be used; and, third, and most important, that there was a specific intent on the part of the particular defendant to defraud, that is, knowingly, wilfully, intentionally to do a wicked act.

Now let us go back and look at some of these three essential elements in a little more detail. Now if you listened attentively, or if you read the statute carefully when you had it in your hands as an item of evidence, you will notice that the emphasis is upon a scheme or artifice to defraud. It isn't necessary for the Government to prove that anybody was in fact defrauded.

To take an extreme case which I used in talking to counsel in advance of the Charge, if two persons agree to try to sell gold bricks as though they were solid gold, and they insert an ad in the newspaper that they have gold for sale at a reduced rate, and they then mail that advertisement to a proposed gullible customer, it isn't necessary for the Government to show that the proposed gullible customer bit.

On my hypothetical case, as put to you just now, there was an intentional scheme to defraud contemplating a use of the mails and the mails were used as a step to carry out the scheme. Of course, and this is an important kind of footnote to this case, it might be that A and B were in the business of supplying theatrical props, and if they put a notice that they had gold bricks for sale in magazines like Variety, which they thought reached the theatrical trade, and the intention was to offer gold bricks as theatrical props rather than as items of great and almost incalculable value,

then there wouldn't be any scheme to defraud. That would be a perfectly legitimate device.

Now I haven't really taken you very far by that gold brick example except to point out to you that it is no part of the necessary proof of the Government that anybody was in fact defrauded. However, I suppose, like any other body of sensible human beings, you will take into account the people who were offered this plan or subjected to this plan and what their responses were as a guideline in determining whether the plan really was a plan to defraud.

In order to constitute a plan or scheme to defraud it is necessary that the plan or scheme should be of a kind which is capable of defrauding the sort of people to whom it is addressed. Now in determining whether a plan is capable of defrauding the kinds of people to whom it is addressed you take into account the whole range of persons to whom it is likely to be offered. You don't consider only the most foolish and least restrained, people who are drunk. You don't take into account only the most sophisticated Police Chiefs. You take into account everybody to whom it is likely to be offered. And in New Hampshire you are entitled to take into account the kinds of people who live in New Hampshire, and particularly the kinds of people who are in the social and economic classes who would probably be the persons to whom the goods were offered, and you take into account their intelligence, their experience and the like.

Now something which to you as very sophisticated people, after five weeks of trial, may be clear, may or may not be clear to somebody who is an average New Hampshire person in the social and economic groups and with the intelligence of average New Hampshire people. I don't flatter you when I say I rather think from looking at you that you may not have been selected merely as a cross-section of New Hampshire. You seem to me to have a little more than perhaps the cross-section Jury qualities which I

observe in Massachusetts. That's a parenthesis, not to be taken as part of the instructions of law and not, please, only as a compliment.

But I am now referring to a passage which was a passage in one of the early Opinions of Mr. Justice Black in Federal Trade Commission against Standard Education Society, 302 United States 112, more particularly about page 116 and 117. Now he was, Mr. Justice Black was dealing with a question of alleged false representations with respect to the sale of encyclopedias, and the salesmen there represented that the company would give customers a set of encyclopedias free provided that they paid $69.50 for the looseleaf supplements which came afterwards. A judge, with whom I have great sympathy of every kind, Judge Learned Hand, thought that, "We cannot take seriously the suggestion that a man who is buying a set of books and a 'ten years' extension service,' will be fatuous"—that means foolish—"will be fatuous enough to be misled by the mere statement that the first are given away, and that he is paying only for the second. Such trivial niceties are too impossible for practical affairs, they are will-o'-the-wisps, which divert attention from substantial evils."

From those remarks and others in his Opinion Judge Learned Hand was adversely criticized and his judgment was reversed by the Supreme Court of the United States, Mr. Justice Black saying, "The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting upon a citizen to suspect the honesty of those with whom he transacts business. Laws are made to protect the trusting as well as the suspicious. The best element of business has long since decided that honesty should govern competitive enterprises, and that the rule of *caveat emptor* should not be relied upon to reward fraud and deception."

Now I don't want you to think that just because I read that Opinion I think that

this particular case which is before you is a clear case for the Government. All I am saying is that the test is not how a—(a bell rings)—Is that serious? We will assume it isn't. The test is not how a sophisticated person reacts. The test is how an average person of a class presumed to be prospective customers would react to the kind of statements which are made.

Now what is a fraud? Of course, a fraud can relate to goods and can be a fraud which involves a misdescription of the goods or their quality, but there is no basis whatsoever in this case for your assuming that there was any misdescription of the Compact Cleaner or vacuum cleaner as such. You saw a demonstration, and I think you will agree with me that there is absolutely nothing which would justify you in concluding that the goods supplied were inferior in quality. If I may be forgiven this, I will tell you that I said to my wife, our wedding anniversary being on Sunday, "I don't think I could do better than to give you a Compact Cleaner," (laughter) as far as its quality goes but we are not dealing with the question of the quality of the cleaner. No case at all turns on that.

The alleged fraud is on the other end of this transaction. That is, the claim is that the customer incurred an obligation which he didn't fully understand, and that the obligations as set forth in the documents prepared by Interstate Engineering Corporation, the Compact Owner-Recommendation Plan, et cetera, were not fully understood, so it is claimed, by the customers because they were diverted by, so it is claimed, misrepresentations of an oral character made to the customers at the time that they were being induced to sign these written agreements, the Conditional Sales Contract and the Promissory Note in particular.

Now although there is a suggestion, and something more than that, in Paragraph One and in Paragraph 19 of Count One of the Indictment that the fraud consisted in part of an omission on the

part of the defendants to state material facts, I instruct you as a matter of law that on the evidence as it developed in this case you could not convict any defendant here on the basis of an omission of a material fact. The only basis upon which I am leaving this case to you are the other aspects of the Indictment which charge that the defendants made material misrepresentations of facts which they knew to be false.

■■ Fraud can include an intentionally false representation of a material fact, and it is up to the jury to determine whether a representation was made, whether it was false, whether it was material and whether it was intentional, the Government having the burden on every one of those aspects.

Was the representation made? That is just a question of fact as to what was said. Was it false? That is, was it true at the time it was said or was it not true at the time it was said? That is a question of fact. Was it material? That is, was it a substantially important fact inducing the customer to act?

You will remember that I said that the chatter about Black & Decker Motors was not material. And some things may be so obviously not material that a Court will say a jury cannot possibly conclude rationally that something is a material misstatement. But there are other matters in this case which I am leaving to you, not the Black & Decker question, which I am taking away from you.

Now was it intentional? That is to say, did the person who is charged with this representation which is said to be false and said to be material, was that made by the individual knowingly with the intent to deceive?

If all those elements are present, and the Government has proved it beyond a reasonable doubt, then it has proved a fraud. I'm sorry. It has proved a scheme to defraud. That slip was an important slip of the tongue because I already told you that the Government doesn't have to prove that there was a victim. There is no burden upon the Government to prove that the plan succeeded. The Government would be happy if it nipped in the bud plans without waiting for success provided that they are fraudulent and intentionally so.

■ With respect to the mails, the second major part that I told you was in this case, the Government has to prove beyond a reasonable doubt that the mails were used, and in each of the counts here there is a specific reference to a specific mailing, but the Government must also prove that the particular individual intended that the mails should be used as part of the scheme. It is not necessary for the Government to show that the particular individual himself dropped the letter in the box. It is quite enough if he caused the letter to be put in the box and if he entered into a plan with the knowledge that the mail was going to be used, you as jurors can find that he caused the mails to be used, if they were used pursuant to his expectation and pursuant to the plan.

Now we come to what Mr. Brown has said is the most important issue—intention. He referred to Genesis, and I shall not add any other authority because I don't suppose there is any higher authority.

There are some crimes which one can commit without a specific intent to commit a crime.

Suppose, for example, you are charged with driving an automobile on the streets of this city without an automobile license in your possession. You forgot that your license expired last week. You did not renew it. If the law of New Hampshire is like the law of Massachusetts you can be convicted even though it was a lapse of memory on your part. You were nonetheless driving without a license, and it isn't necessary to show that you had the specific intent to drive without a license.

The present statute is not like this hypothetical motor vehicle law in New Hampshire. In this statute before anybody can be convicted he personally, or in the case of a corporation its authoriz-

ed representative personally, must have the intent, the specific intent to do wrong. He must be acting knowingly to defraud and meaning to participate in it.

Now I am not going to go over in detail evidence with respect to such matters as knowledge and the like. Counsel did a very good job, I think we will all agree, in addressing you on the specific evidence as they recalled it, and I am sure you recall it very well.

Mr. Brown told us of, according to his count, a score of customers, who consisted of 12, I believe, that the Government produced in its direct case and five that the New Hampshire defendants produced and three that the Government produced in rebuttal.

 Mr. Wall reminded us of representatives who had come to the stand, who were salesmen, and indeed there were other representatives called, some by the defense and some by the Government, who were clerks, and there were individual defendants, each of whom took the stand. You have ample evidence which will enable you to determine whether indeed there was a plan or scheme to defraud, whether it was part of the scheme to use the mails and the mails were used, and whether any particular defendant had or did not have the necessary intent.

I told you that Mr. Brown had a hard job because he had to represent so many different persons, but he would want you to look very carefully at each of his clients separately. So would Mr. Wall. In fact, Mr. Wall went through with rather great care what he thought was the evidence with respect to each of the individual New Hampshire defendants and their intention or lack of intention.

Again you will have this problem in connection with intention of weighing what there is, if anything, in the exculpation, in the relief from blameworthiness, furnished by the opinions given by counsel, by Mr. Connor, to the New Hampshire defendants, and by Mr. Gute

to the California defendant. I have told you the principles to apply, and I really do not want to comment upon Mr. Connor or Mr. Gute, or any other lawyer, more than to tell you what principles are to be applied.

Now I think it is at least time, and maybe some of you will have thought I should have done this earlier, it is at least time to look at the particular Indictment and what parts of it survive. Before I do that, let me just repeat some of the things which have been said in argument, but it is rather important they should be said by the Judge as well.

If the Indictment says there is something wrong in forming the corporations, New England Enterprises, Inc. and National Budget Corporation, I tell you there is nothing to that charge. It isn't wrongful at all.

If there is any suggestion in the Indictment that there is anything wrong in conducting a Cadillac Contest, or any implication, direct or otherwise, that the Cadillac Contest was run in an improper way, there is nothing to that.

If there is any suggestion that the S&H Green Stamps were improperly used, there is nothing to that.

If there is anything with regard to the Black & Decker motor, you can forget that also. There is nothing to that.

I have already drawn to your attention that National Budget Corporation is no longer in this case, it having been acquitted.

 Now I want to make it clear that under this Indictment and under my instructions a referral scheme of selling as such is not a fraudulent scheme. That is to say, there can be bona fide referral schemes. I am not saying this is one. I am leaving that to you. But it is perfectly consistent with the declared law in the Federal and State decisions for a scheme to be operated as a referral scheme in which a customer is offered by a seller the opportunity to get a reduction in price, or a bonus, or some other kind of advantage from furnishing the name of some pros-

pect who indeed later on does become a customer.

Referral schemes are not necessarily fraudulent. If they were, presumably the Federal Trade Commission would never have issued the Order which is before you as Exhibit 32-A because you will notice that the Federal Trade Commission did not outlaw referral systems, it merely put conditions with respect to what referral systems hereafter used by the defendants involved in that proceeding would have to do in order to comply with the prospective provisions of that Order.

I further instruct you as a matter of law that despite what is said in Paragraph 19 of the Indictment, and I pause to allow you to turn to it, you cannot convict the defendants in this case on the basis of an endless chain theory, or a geometric progression theory, or something of that sort.

As the plan was explained to us by all the witnesses, the maximum period of time open to a customer to furnish names of prospects was six months. There was no indication at all that within that period of time so many names could be dug up as to create a problem of exhaustion of potential customers. There is no indication before us that there was a promise on the part of Interstate, the California corporation, or New England Enterprises, or anybody else, that this system would be carried on forever and a day in an endless form. And, therefore, whatever might be appropriate under other kinds of chain systems, you cannot convict on the basis of what is set forth in Paragraph 19 of Count One.

■■■ Nor can you hold it against the defendants as a fraud if they refused to take back merchandise whenever a customer wanted it taken back. Under the applicable law a customer has undoubtedly a right to have his transaction rescinded if there were a fraud, or if there were some other defect of a kind recognized under what is now called the Commercial Code and used to be called the Sales Act. But the fact that a seller

isn't willing to take back merchandise doesn't constitute a fraud. You and I may have dealt with merchants who in a kindly way were willing to take back goods which we bought, but the fact that as a matter of courtesy merchants often take back goods in order to have good will doesn't mean that there is any legal obligation to take back goods unless the goods were sold fraudulently, or in a way that involved a misdescription of quality or quantity, or involved some other defect in the goods themselves, or in the transaction, such as is recognized under the law.

Now there is another point which I don't think I can emphasize sufficiently because here I really think that the Indictment repeatedly relies upon something which just is not the law. The Indictment frequently makes references to the fact that part of the fraudulent scheme was to sell Compact Cleaners at a grossly inflated price.

■■ Now I'm not concerned at all, and neither are you, with what it cost Interstate Engineering Corporation to manufacture the vacuum cleaner or Compact Cleaner compared with what was the price at which it was offered for sale. It is not a fraud for the manufacturer of a product to set the sale price at many times the cost to the manufacturer. Every one of you who goes to a drugstore and buys a pill ought to know that. Most drugs are sold at many multiples of the cost of producing the drug. And it is not a fraud for a manufacturer to set a sales price unrelated to the production cost, absent of course some special legislation with respect to the matter, and nobody, as far as I know, has pointed out any act of Congress, or any act of any State in the United States, which limits the amount of profit which a manufacturer can get upon his products. The limit is furnished by the market, by free and open competition.

■ The contrary view, which, I must say, repeatedly occurs here, reflects something other than the system under which we are now operating in our

economy. You may not like the system but that does not make it a fraudulent scheme to sell goods at many times their cost. That is in the case of a manufactured product. The situation may be different with respect to other types of products, and I am not going into that because I don't owe you a general lecture on that subject. Now let's see what is really the gist of what is left of the Charge and, as I have indicated previously, the Government does not have to prove every aspect of the alleged misrepresentation because the alleged misrepresentation had a number of different asserted elements in it. All that the Government has to prove beyond a reasonable doubt is that the misrepresentations were made, and that they were material, and that they were false and were known to be false, and that under these circumstances they constituted a scheme to defraud, which included the specific purpose of using the mails as part of the scheme and which also was carried forward with the specific intent of committing a fraud.

Now this brings us down a little closer to the real parts of the Indictment which survive. Suppose you each take the Indictment and follow it with me on the parts which I think are now of some possible significance.

Count 1, "That, beginning prior to January 1, 1963, and continuing up to the date of this indictment, and thereafter, the defendants, Interstate Engineering Corporation, New England Enterprises, Inc.," and strike out National Budget Corporation, "David G. McCadden, Ralph H. Lucht, Kenneth R. Bauer, Robert L. Marquis, and Eugene L. Michaud, did in the District of New Hampshire, and at other places unknown to the Grand Jury, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property, by means of false and fraudulent pretenses, representations and promises hereinafter more particularly set forth, from the following persons:" and I will only read the last names, "Abbott, Domina, Edmunds," and I skip Flechtner because I remember no testimony about him and I skip Heaps, "King, Lajoie, Robertshaw, Rosswaag," and I skip Pierre, "Santoline," and I skip Tardif—

MR. BROWN. Tardif was here.

THE COURT. I am sorry. Tardif was here. Tardif I add. "Temple, Thibaudeau, Tome, Tracewski, Vaillancourt, Westgate" and "Young, and others who, by reason of their number and lack of information on the part of the Grand Jury, are not susceptible to being named in this indictment, and hereinafter referred to as purchasers, representing that class of persons who could be induced by the defendants to sign an installment sales contract for the purchase of a Compact vacuum cleaner, through misrepresentations, false and fraudulent pretenses, by means of untrue statements of material facts." and I leave out the next clause, "which scheme and artifice to defraud, was in substance as follows:" and I skip all of Paragraph 2, which seems to me to be no longer before you, and I skip Paragraph 3 for reasons that I have tried to make plain previously. I skip the first sentence in Paragraph 4. "It was a further part of the scheme and artifice to defraud purchasers that Interstate Engineering Corporation would furnish or otherwise place in the hands of New England Enterprises, Inc., and the salesmen or other representatives dealing in their products, the means and instrumentalities by and through which the said salesmen or other representatives could and did directly or indirectly mislead and deceive the consumer public."

In Paragraph 5 I skip the first sentence as being no longer of any importance and I am going to skip the last clause of the second sentence or the last part of it.
"It was a further part of the scheme and artifice to defraud purchasers that this contest would be used by the defendants as a lure to entice prospective victims into permitting salesmen or other representatives of the defendants to gain entrance to their homes without disclosing their true nature and purpose, to

wit: the sale of a Compact vacuum cleaner."

And I strike out the words "at a grossly inflated price," for reasons I have tried to explain to you.

"6. It was a further part of the scheme and artifice to defraud purchasers that the defendants would and did cause letters describing the so-called Cadillac and S&H Green Stamp contest to be sent through the United States Mails by previous purchasers of the Compact vacuum cleaner to their best friends and acquaintances urging them to agree to an appointment to witness 'a most amazing new idea.'" Number 10. "It was part of the scheme and artifice to defraud purchasers that the defendants would furnish salesmen and other representatives with certain sales manuals and guides that contained fraudulent and misleading representations that were intended to deceive persons of ordinary prudence and comprehension. It was a further part of the scheme and artifice to defraud purchasers that the salesmen and other representatives in turn used these misrepresentations to obtain the signatures of persons on sales contracts by deception." Number 11. "It was part of the scheme and artifice to defraud purchasers for the salesman or other representative, in detailing the referral plan, to reply in the negative whenever he was asked by the prospect, in the early part of his presentation, if he was selling anything, and to falsely explain in substance that he was only advertising and/or demonstrating a new product in order to establish a brand name, whereas in truth and in fact, as the defendants well knew, the one and only reason that the salesman or other representative was at the prospect's home was to sell a Compact vacuum cleaner."

Strike out the words "at a grossly inflated price." And thereby obtain a substantial commission." "12. It was part of the scheme and artifice to defraud purchasers that the salesman or other representatives would repeatedly dwell upon the claim that Interstate Engineering Corporation was no longer advertising the Compact vacuum cleaner by conventional means such as via magazines, newspapers, direct mail and television; furthermore, that the prospect in whose home the salesman was at the time was being given an opportunity to earn some of this advertising money that had formerly been wasted."

Number 13 is out. Number 14, and here we come to something which is more nearly central in the Indictment. I am not saying anything about whether it is proved. "It was a part of the scheme and artifice to defraud purchasers that the salesmen or other representatives would and did mislead said prospective purchasers into believing that, because of the operation of the referral plan, they would obtain the Compact vacuum cleaner for only $19.90, and that any other costs would be recouped through bonus-commission payments of $25.00 each by merely sending the Cadillac-contest letters to their best friends, and further, that the purchasers would likely receive additional income."

Number 17 you may disregard entirely. That business about transfer of an installment contract is really of no importance. Number 18 you may disregard. It may be treated as struck. The same is true of 19, the one which refers to the chain system.

Now with regard to 20 I am going to allow all except (i) to stand, and when I come to (j) and (k) I am going to call your attention to those two paragraphs as being central in connection with the claim of the Government. Not necessarily am I indicating any view at all with respect to whether the Government has proved the points, or proved them beyond a reasonable doubt, as I should say.

Paragraph 20. "It was a further part of the scheme and artifice to defraud purchasers the defendants, aided and abetted by each other, and aided and abetted by their salesmen or other representatives, made the following false fraudulent pretenses, representations and promises, in the sale of Compact vacuum cleaners by the referral method,

well knowing at the time that the pretenses, representations and promises were false when made:

(a) That the referral plan, as presented, was an advertising plan.

(b) That the referral plan was being used by the Interstate Engineering Corporation and by New England Enterprises, Inc., as a 'word of mouth' method of advertising the merits of the Compact vacuum cleaner.

(c) That advertising funds formerly used on television, radio, magazine, direct mail and newspaper advertising were being channeled to the 'word of mouth' advertising of the referral plan.

(d) That the Interstate Engineering Corporation was channeling advertising money into the referral plan to pay people to do their advertising.

(e) That one of the chief reasons the salesman or other representative was at the prospective purchaser's home was to establish a brand name.

(f) That the salesman or other representative was not selling anything, but was only at the prospective purchaser's home for the purpose of demonstrating 'a most amazing new idea.'

(g) That the Interstate Engineering Corporation had not as yet placed this unit of the Compact vacuum cleaner on sale in stores.

(h) That when the Compact vacuum cleaner was placed on sale in stores in three to six years the retail price would be $249.90."

(i) is struck.

Now most of what I have read in (a) through (g) is certainly not of the kind that you would find to be a material misrepresentation. It wouldn't be a very important inducing cause. But I think (j) and (k) present more serious issues for your deliberation.

"(j) That if the purchaser of a Compact vacuum cleaner furnished the names of 50 people as prospects, all of these 50 people would be contacted by the defendants, and that at least 50 per cent of these prospects would be sold a vacuum cleaner which would result in the person furnishing the names being paid 25 bonuses of $25.00 each, for a total of $625.00."

Before I leave that subparagraph I must point out to you a very important difference of view between the Government and the defendants. The Government says that the promise was a promise that 50 per cent of the persons whose names were given on cards would become customers. The defendants take the view that the 50 per cent relates to 50 per cent of those with whom appointments were made would ultimately become customers.

Now I am not taking any position one way or the other. You will have a chance to consider Exhibit 2-C, as I explain it later. You will have a chance to consider whether Exhibit 2-C was subjected to oral modification or not, and you will have all the evidence in the case in connection with this matter.

I turn now to (k).

"That the only reason the signature of the purchaser was required on a sales contract was to 'motivate' them to send out the referral cards to new prospects.

"21. That on or about January 6"— by the way that (k) is one of the paragraphs I said you ought to pay special attention to to see whether the evidence does or does not support that.

"21. That on or about January 6, 1965, at Manchester, in the State and District of New Hampshire, the said defendants, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting so to do, caused to be mailed, a letter addressed to Mr. and Mrs. Ralph Abbott, 12 Keesor Court, Laconia, N. H., to be sent and delivered by the Post Office Department of the United States in violation of Title 18, Section 1341, United States Code."

Well, I am not going to read the other counts that remain in the case because they incorporate by reference everything except Paragraph 21, and they have their own mailing date, and it isn't necessary for me to do it at this stage.

Now you will realize from what you have heard for weeks, and also I think you will have it even more clearly brought out from my going over that Indictment with you, that what the Government is seeking to establish beyond a reasonable doubt is that the nature of the sales presentation was such as to constitute a fraud because it misled average people in understanding the obligations to which they became subject and the rights which they would have, and more particularly misled them, according to the Government, with respect to what their chances were with respect to the number of persons who would enroll as a result of recommendations by the customer and misled them as to what was the purpose of signing this conditional sales contract, it being the Government's theory that the customers were misled into thinking that they were being motivated rather than bound firmly by an installment contract and promissory note scheme.

Now I think it is perfectly clear that anybody who reads all the documents in Exhibit 2, the kind of documents which originated with Interstate, and which I referred to previously, the Owner-Recommendation Plan, and so forth, it is perfectly clear that anybody who read all the documents and understood them was put on notice about everything and couldn't have been defrauded if he really read them and understood them. But the question is whether the presentation was such as to discourage a full reading or was such as to lead people to think that in spite of what it said in writing the total situation was different.

Now I think that it is fair to say that in considering this you have got to take into account New Hampshire people. You have to take into account average people of the kind that would purchase on door-to-door canvassing. Probably the affluent members of the New Hampshire community do not buy large items as a result of door-to-door canvassing. Probably door-to-door canvassing of this kind is addressed to people in the middle and lower groups of the community from a social and economic point of view.

At any rate, unless I'm mistaken, we didn't have any bank presidents or lawyers on the stand here as customers, and probably they weren't the people that were aimed at in connection with the distribution. You saw the kinds of people that were the customers, and you know what kinds of people were likely to be included within the solicitation. Whether they are the kinds of people who read documents and understand them is something that you know about infinitely better than I.

You are entitled to take into account what was brought out again and again in the examination and cross-examination, that many of these people were not naive. They had been in the business of buying things on installments. They had dealt with finance companies. But here we are in an area that again I remind you is like Lord Devlin's statement of yours being a parliament. You are really trying to tell us indirectly through your verdict or verdicts whether everything considered this kind of scheme is in the context of New Hampshire prospective customers misleading, and I assure you that the combined knowledge of the jurors, in fact probably the knowledge of any one of them, exceeds the knowledge of this Massachusetts Judge, who I think as an ex-lawyer was out of the range of probable solicitation.

Now you have often heard in this case reference to Exhibits 2-A, B and C, and there is a great question before you as to which please be clear I am expressing no view. The question is whether Exhibits 2-A, B and C represent what was in fact said to customers.

The defendants take the position that those were general guides to be adapted in each case to the experience of the particular salesman and were, as it were, oh, general manuals but not any more binding upon a salesman than manuals of Jury instructions are binding upon a Judge. Maybe he gets some comfort out of them and maybe he doesn't.

On the other hand, the Government says, and I hope I do Mr. Wall no injustice when I quote his profanity, "For God's sakes, what other purpose did they have, these Exhibits 2-A, B and C except to tell the salesman what he ought to say?"

Well, it's up to you, it's not up to me, to decide which, if either of those theories of Exhibits 2-A, B and C you want to accept.

Now, of course, in connection with Exhibits 2-A, B and C, there is no doubt that 2-C is the one which has caused the most discussion in the evidence, and if you will turn to 2-C, I must remind you that it is not agreed by the defendants that 2-C is what the salesman actually said. It is the view of the defendants that this was just a kind of set of possible instructions to be regarded or disregarded according to your own individual experience as a salesman.

Much emphasis was laid on Paragraph 7 of Exhibit 2-C, "What would you say if tonight and tonight only you could have the Compact attachments, Polish-Aire, everything you have seen here for as little as $19.90?"

Now some of the examination and cross-examination suggested that salesmen in fact said, "As little as $19.90 down." Some of the testimony was in another sense. And it is up to you to determine which of that testimony you believe, whether the prospective customer was being told that this was a down payment or whether this was the total business, the total amount that he would have to pay.

Your attention was drawn repeatedly to Paragraph 15, "Now let's say you send us to see 50 people, at least 50 percent will qualify. That's 25 times $25 is $625. Could you use that kind of money?"

Well, I don't have to remind you that the question in part is what is the significance of the words "Now let's say you send us to see 50 people." Does that refer to 50 people who allow New England Enterprises, Inc. in pursuant to an appointment, or does it refer to 50 people whose names are upon cards originally delivered by the customer either to the salesman or to the home office of New England Enterprises, Inc.? I'm not trying to tell you which it is, and I'm not trying to tell you whether or not the exact wording was used by any particular customer—I'm sorry—salesman. That's all for you. I'm just trying to highlight what are the points of difference between the Government and the defendants which seem to me especially significant.

Now Paragraph 16 also caused the introduction of much testimony. "People are basically lazy. To motivate them we simply set this on 18 installments of $15.07 and the first ten checks take care of the Compact." Well, the Government's theory is, if I understand it, that this sales talk had the effect of making the average person suppose that although these installments were provided under the contract the checks would come in first, the bonus checks would come in first, and there really would be no installments to pay, whereas the defendants take the view that obviously this refers to what is indeed the fact under Interstate Engineering Corporation's printed documents that there are to be installments and that bonuses are to be paid only if earned and only if the people who are listed as prospects and who are later interviewed turn out in fact to be customers who indeed do purchase Compact Cleaners and thus earn for the referring customer the appropriate $25 per customer.

You will realize that up to now most of what I said relates primarily, though not exclusively, to the New Hampshire defendants. And now let me draw to your attention what you perhaps did not particularly notice as I was reading the Indictment.

Paragraph 20 says as I read it that "It was a further part of the scheme and artifice to defraud purchasers that the defendants, aided and abetted by each other, and aided and abetted by their

salesmen or other representatives, made the following false and fraudulent pretenses * * * " As I have looked upon this case Interstate Engineering Corporation could be found by you to be guilty only if you find that they aided and abetted one or more of the New Hampshire defendants in a fraudulent scheme. The words "aiding and abetting" are very old. To those of you who have familiarity with older English literature it may at once be apparent that there is in this combined set of verbs "aiding and abetting" an element of purposefulness, that is, a wish not only to carry on one's normal activities but to share in a wicked purpose.

▉▉▉ What is to aid and abet? It is knowingly to participate in. That is, purposefully to give substantial assistance to another to help him commit a crime. In order to convict anybody of aiding and abetting, the Government must prove beyond a reasonable doubt that the person who is being aided, that is, the other person, must be intentionally committing a crime. Second, the aider or abettor must know that the other is committing a crime. Third, the aider or abettor must have the purpose to aid that other to commit the crime. And, finally, forth, the aider must in fact render aid or assistance. The Government has to prove all of those elements before somebody can be convicted of aiding and abetting another to commit a crime.

Now if you have followed what I have said, it is plain that nobody can be convicted of aiding and abetting a criminal unless the person aided and abetted is committing a crime. So in your jury deliberations, as in my Charge, you will have no reason to take into account anything against Interstate Engineering Corporation unless you have already disposed of the case in regard to the New Hampshire defendants. If you have acquitted all the New Hampshire defendants, why, you will have to acquit the California corporation. But if you have convicted any of the New Hampshire defendants, you will have to take a look

and see what the situation is with respect to the California corporation.

With respect to the evidence in this case, there is no evidence that Interstate Engineering Corporation knew about the sales presentation in New Hampshire before Mr. Zobel arrived on the scene. He arrived on the 27th of July, but he learned the facts, as far as we know, on the 28th of July, 1965. Anything earlier than that isn't to be charged at all against the California corporation, and that is why I acquitted them with respect to all the counts other than Count 35. I left to you whether in the one count which involves a mailing subsequent to the 28th of July, 1965 the California corporation is or is not guilty of aiding and abetting.

Now let me repeat what I think I told you at the end of the Government's case when I was instructing you as to certain judgments of acquittal which I then entered. The fact that I entered judgments of acquittal with respect to certain counts or with respect to a particular corporation, National Budget Corporation, has no negative pregnant. That is, it does not carry with it an implication that I think the other defendants are guilty, or that on the other counts left in the case you ought to find the defendants guilty.

All that I have done is I have said that as to some of these counts there is no evidence on which a Jury could rationally come to a conclusion of guilt, and against National Budget Corporation there is no evidence upon which a Jury could rationally convict, but I am not implying that were I the Jury I would convict the remaining defendants upon the remaining counts. That's all up to you. It isn't to be decided by me, and there is no implication in my previous action as to how I would act.

Now what about Mr. Zobel's appearance here in New Hampshire? There isn't much doubt that he saw Exhibits 2-A, B and C, I think you will conclude. He testified he saw them. There isn't much doubt that he was a sales repre-

sentative authorized to act for Interstate Engineering Corporation. He so testified. The evidence was supported by all kinds of photographic and perhaps photogenic evidence.

Now what did he do when he was here? I am going to remind you that it's your memory and not mine that counts. It is perfectly plain that he knew about complaints. It is also perfectly plain, isn't it, that he didn't read the complaints but he left them to others to take care of? Isn't it clear that although he made some suggestions, he didn't tell us what suggestions he made in detail as to changes in the program? He merely said he was fully satisfied, if I remember correctly, that the changes made the presentation all right.

And am I wrong in my recollection that Mr. McCadden and Mr. Lucht when pressed to tell us what it was that Mr. Zobel criticized, Mr. Zobel, according to them, criticized part of the presentation on the ground that it expressed the wrong number of persons who had been involved in a study which had been made as to what was the favorite, necessary household tool which members of ordinary households would like to see manufactured? And that he made some other, if I am not mistaken, subsidiary additional comments.

Now when he went home what did Mr. Zobel do, or what did Interstate Engineering Corporation do? Now is there any doubt, it has been stipulated in fact so there can't be any doubt, that Interstate Engineering Corporation continued to send Compact cleaners into New Hampshire to New England Enterprises, Inc.? It also sent the Green Stamps which are referred to in the last paragraph of Count 35 as being matters which were mailed.

Now Mr. Phinney in his argument pressed hard on the point that there was no evidence of any complaint of any defendant doing anything wrong after July 28, 1965. Well, I think the statement made by Mr. Phinney will probably accord with your recollection as it accords with mine if what that statement means is that there is no evidence that after July 28, 1965 any customer was in fact deceived. But I hope you will remember what I said to you much earlier and emphasized several times that the Government doesn't have the burden of proving that anybody was deceived. Plans to sell gold bricks carried forward by the use of the mails, offering such gold bricks as though they were bullion, constitutes a mail fraud even though there are no suckers on the scene.

Let me come a little closer to this case by analogy, and mind you I am not trying to decide the issues as to whether Interstate Engineering knew that the New Hampshire defendants were violating the Mail Fraud Statute, I am not trying to deal with the issue whether as a matter of fact having such knowledge Interstate Engineering Corporation had the purpose substantially to facilitate and promote a known fraud. But I am going to give you an example which may be helpful in your approach, and it may not be. You don't have to accept this analogy. It isn't intended to carry with it any implication beyond responding to the suggestion of Mr. Phinney that I should carefully define this problem which arises out of the absence of any evidence that there was any complaint of any defendant doing wrong after July 28, 1965.

Suppose that X is a manufacturer of sugar and Y is an illicit distiller of alcohol, that is to say, somebody who is making bootleg liquor in violation of Federal law. X for a long period of time supplies sugar to Y having absolutely no knowledge of what Y wants it for. Y, as far as X knows, may be manufacturing chocolate candies. But one day an authorized representative of X goes to visit Y's premises and discovers that Y is in fact operating a distillery to produce moonshine whiskey. Thereafter, Y places orders for large quantities of sugar of a kind which X fills having knowledge of Y's past conduct and probable future purposes.

At that stage X continues to ship to Y. Y does not in fact sell any of this liquor before the Government comes down on the whole works. Y is convicted of a plan, Y and Y's employees are convicted of a plan to defraud the United States by manufacturing liquor without getting the necessary revenue stamps. Under these supposed circumstances X could be convicted of aiding and abetting the plan, aiding and abetting the planners.

■ And the question which you have to decide is whether or not after the 28th of July, 1965 the New Hampshire defendants, if they ever planned, continued to plan to defraud by misrepresentations, and whether knowing of that supposed plan the California corporation continued to supply vacuum cleaners, stamps, et cetera, for the purpose of enabling that plan to be carried out in the future.

I once more state to you that for aiding and abetting it is necessary to prove beyond a reasonable doubt that the person being aided or alleged to be aided was intentionally and is intentionally committing a crime; second, that the aider or abettor knows that the other is committing the crime; third, that the aider or abettor has the purpose to aid in the future; and, fourth, the aider actually renders assistance or aid.

I am now going to come to some concluding remarks. With respect to each defendant on each count you are required to be unanimous. In considering your verdict each of you is to use his reason and to be faithful to his conscience. You are sworn on a most solemn oath. Remember what is at stake here, what is at stake from the point of view of each of the defendants and from the point of view of the community. Of course, initially you will probably not all agree. Listen carefully to the arguments of your fellow jurors. The jury room is no place for stubborn pride of opinion. I assure you that you are as good a jury as will ever be found to try this case. It is important if you

can agree without any sacrifice of conscience for you to agree. It has been a long and an expensive trial, but that is of secondary importance. It is a trial which raises an issue or set of issues which, I think we will all agree, are of great concern to these individuals and to the community. The defendants want your verdict, the Government wants your verdict, the community wants your verdict, and if you do not agree presumably some other jurors will have to go through this whole process to arrive at some verdicts.

I must point out to you that you are free to follow a provision under the Federal Rules of Criminal Procedure, but I am not suggesting you should do it. It is up to you. You are free to report verdicts with respect to some of the defendants and some of the counts before you report all of the verdicts. It is provided in Rule 31(b), "If there are two or more defendants, the jury at any time during its deliberations may return a verdict or verdicts with respect to a defendant or defendants as to whom it has agreed; if the jury cannot agree with respect to all, the defendant or defendants as to whom it does not agree may be tried again."

■ In New Hampshire, as indeed in Massachusetts, in criminal cases, the verdict is given orally by the Foreman and is not written out. The Foreman is the spokesman of the jury. He is their chairman. His vote counts otherwise for no more than that of any one else. But he will presumably help you in connection with arranging the order of discussion. He is as it were responsible for the clarity of your deliberations.

I think it is plain enough from my instructions that the Foreman will probably choose to consider the case of the New Hampshire defendants before turning to the California defendant because if all the New Hampshire defendants are acquitted you will have to acquit the California defendants. I am not telling you in what order to take the individuals or the corporation in New Hamp-

shire but I do again remind you that each individual and each corporation is entitled to be considered separately.

If you have any trouble with your deliberations, and it is absolutely necessary, then you, Mr. Foreman, may put in writing a question to me, and that sealed question will be brought to me by the Court Officer, and I will read it, and if I think it appropriate, after consulting with counsel, I will bring you back into the courtroom and give you further instructions.

Now, of course, you carry out with you the exhibits. You do not carry out with you the transcript of the oral evidence. That doesn't mean the transcript is less important. It is up to you whether the oral testimony is more or less important than the written testimony. There are several reasons why you don't carry out the oral testimony in transcript form. One very sufficient reason is it hasn't all been typed. There is a second reason, however, which is also important, and that is that on almost every day's transcript certain matters were never called to your attention but were discussions at the bench with the Judge and are not for your consideration and shouldn't reach you indirectly or directly by giving you the full transcript, including, of course, those parts which were excluded from your consideration.

So far as your meals and lodging go, they will be taken care of in accordance with the usual practice in this District. I believe that, taking into account the hour, you will be taken to lunch very promptly, and probably, if you haven't reached verdicts by 6:00 o'clock or so, you will be taken out to supper, and probably at about 9:00 or 10:00 o'clock, if you haven't reached verdicts, you will be lodged at an appropriate place in town.

I hardly need remind you that you are not under any circumstances to discuss the case in the presence of anyone except the 12 jurors finally sitting in this case. Don't discuss it with Court Officers or with lawyers or with parties or with some strangers in the hotel or with the waitresses. We know perfectly well that in this particular case the restaurant business has a special relationship to some aspects of the matter.

Now counsel will be available, as the Judge will be available, if there are further points. This is a very important case. We are sitting in Concord, in a city in which quite appropriately there is a statue of Daniel Webster. One quotation of Daniel Webster which you will see upon the walls of the Department of Justice Building in Washington is that, "The highest interest of man on earth is justice." You are now part of the process of justice.

I will listen to counsel. The two alternates I must discharge now with thanks for their services.

(Conference at the bench between Court and counsel as follows:

MR. WALL. I wanted to mention, your Honor that 2–A, B and C have not been agreed upon by defense counsel for Interstate as being admissible against Interstate. My recollection was that—

THE COURT. They saw 2–A, B and C, Mr. Zobel saw them.

MR. WALL. Yes, sir.

MR. CALL. Well, we didn't see Greenwood's 2–A, B and C with his handwritten notations.

THE COURT. Not with the handwritten notations. Is there a different version?

MR. CALL. But except for the notations Mr. Zobel said he saw what looked like 2–A, B and C, but I don't know whether what Greenwood had was his own personal stuff.

MR. WALL. Zobel identified them from the stand, 2–A, B and C.

MR. CALL. Not the handwritten version.

MR. PHINNEY. Something similar to it.

MR. BROWN. Among my exhibits is a clean set of the same thing. I don't recall the number at this moment, but I put it in in my own case.

THE COURT. Could you—if you could pick out that, it would be very helpful.

MR. WALL. Is that 117?

THE COURT. Those are the copies that Mr. Zobel saw, are they?

MR. CALL. Yes, your Honor.

THE COURT. All right.

To the jury: I, Mr. Foreman and members of Jury, have indicated Mr. Zobel saw Exhibits 2–A, B and C. By agreement of counsel, I should have referred to Exhibits 117—

MR. BROWN. E–117–A, your Honor.

THE COURT.—E–117–A, which is not precisely the same as Exhibits 2–A, B and C because it doesn't have notations on them and is a somewhat different set of words. But you look at Exhibit B–117–A in considering—you haven't got it in front of you but you will have it in the jury room.

MR. WALL. Excuse me, your Honor. That is A, B and C, E–117.

THE COURT. It is E–117–A, B and C. That is the set of documents which was seen by Mr. Zobel.

MR. CALL. Your Honor—

THE COURT. Well, wait for Mr. Wall.

MR. CALL. I'm sorry.

MR. WALL. I think that is all I have.

THE COURT. All right. Now Mr. Brown.

MR. BROWN. I picked up two, what I think are, errors which your Honor might want to correct. In your Honor's remarks about Mr. Connor you indicated to the jury that there was no evidence he reviewed the documents in connection with this mail fraud situation.

THE COURT. I don't think I said that but I will be very glad to make it clear.

MR. BROWN. It was actually the time—you pinned him down to the time, and it was within a day or so of the 18th of October.

THE COURT. I only said the month of October. I didn't put a date on it.

MR. BROWN. It was in connection with the Postal inspection he made the review.

MR. WALL. I would like to see that before your Honor says anything to the jury. Your Honor, I was reading from the cross yesterday, my question about whether he considered the statute and the decisions, and I don't have the transcript—

THE COURT. That is not the point which is being made by Mr. Brown.

MR. BROWN. That is correct. He said he read the statute and—

MR. WALL. He said he read neither.

THE COURT. To the jury: I leave it to the jury to consider whether indeed Mr. Connor had taken into account in his opinion the Federal statute with respect to Mail Fraud. There seems to be some difference of opinion among counsel as to what the testimony was, and I would not want the jury to accept my recollection.

I strike that part of the Charge because I certainly don't intend to lead them on a question of fact.

MR. BROWN. Your Honor inadvertently said that with regard to the language of selling 50 per cent of the people to whom you send us to see that the defense position was that we would sell 50 per cent of appointments, and that is not our position. It is 50 per cent of the demonstrations. It was a slip of the tongue.

THE COURT. To the jury: I seem to have made some mistake in stating the defendants' position with respect to Exhibit 2–C, Paragraph 15. The position that the defendants take is that the language which reads as follows:

"Now let's say you send us to see 50 people" means, according to the defendants, "Now let's say we, as a result of your recommendation and the appointments we make, actually get in to see 50 people in their homes."

MR. BROWN. The other objections I have are for the record.

THE COURT. I would rather you make them now.

MR. BROWN. Very good. For the defendants whom I represent I object to the Court's failure to grant in substance our Requests for Instructions No. 1, 20, 21—

THE COURT. Now wait a minute, please.

MR. BROWN. I'm sorry.

THE COURT. 1 I know about.

MR. CALL. We all know about that.

THE COURT. Well, I have read the two pages of Requested Instruction No. 20. Now Requested Instruction No. 21.

MR. BROWN. Yes, your Honor.

■ THE COURT. I will be glad to say that if you want me to. To the jury: There is a difference between testifying as a witness in court and being a salesman selling products or programs as you observed. In the law puffing or exaggerating the merits of whatever is being sold is recognized as part of the art of selling and as long as such exaggeration is engaged in without actual intention to defraud and without actual falsification or misrepresentation of material or important matters to induce the sale by fraud the law permits it. As applied to this case, if you find that any one or all of the defendants exaggerated the merits of the Compact Cleaner—there is no evidence that any of them exaggerated the merits. On the contrary, I told you it was an excellent cleaner. I gave you the most dramatic instance of it.

"—or if you find that they exaggerated the merits of the Owner-Recommendation Program as part of their selling techniques, and you further find they did sell without intention to defraud or without falsification or misrepresentation of material facts, then you shall not consider that exaggeration as any evidence of crime or of criminal intention."

MR. BROWN. What is 20?

THE COURT. 20 is two pages too long.

MR. BROWN. What is 22?

THE COURT. 22 is another long one.

MR. BROWN. Well, I don't want to impose upon the Court.

THE COURT. All right. I don't want exceptions taken that I haven't had a chance to look at. Well, I am perfectly willing to read this.

MR. BROWN. May I just—

MR. WALL. Yes, sir.

THE COURT. To the jury: You have had evidence of how many names of persons being referred to New England Enterprises, Inc. during the years 1963, 1964 and 1965 produced how many appointments, how many demonstrations resulted from these appointments and how many sales resulted from these demonstrations. These statistics indicated generally that on the average about 100 names were producing 10 sales and that about 35 per cent of the demonstrations produced sales.

You have also heard evidence that every one of the individual defendants have from time to time sold 50 per cent or more of the persons to whom they demonstrated the Compact.

You are entitled to find on this evidence that representations, if made, that 10 or more bonus checks *might* be earned by persons joining the program were reasonable and were not misrepresentations.

You are also entitled to find on this evidence that representations, if made, that 50 per cent of the referred persons who would view the demonstration *might* be sold were also reasonable and were not misrepresentations.

While there is no evidence that these statistics as to what New England Enterprises, Inc. experience was had been developed until after the indictment, the general results that might be expected were known to New England Enterprises, Inc. from the so-called Wolf worksheet and the New Hampshire defendants were entitled to make representations on the assumption that these results would

be experienced and the evidence shows that they were.

MR. BROWN. 25 we don't consider to have been adequately covered. I think your Honor covered the first portion but not the second portion.

THE COURT. Well, of course I will be glad to say that.

MR. BROWN. I am sure it was not intentionally omitted, your Honor.

THE COURT. To the jury: You have heard evidence from eight complaining customers other than Abbott, Edmunds, King, but this evidence was introduced solely as it may bear on the intention of the defendants to engage in a fraudulent scheme and you are not to consider such evidence as showing the commission of any other offense not on trial here.

If the evidence assists you in determining the intention of the defendants, or any of them in relation to the four counts on trial, you may use it for that purpose. You may also use it for the purpose of determining whether there was in general a plan or scheme to defraud.

MR. BROWN. On my requests, those are the only objections I have, your Honor. I object to the Court's incorporating Government's Requests 11, 16 and 19, insofar as that was done.

THE COURT. Excuse me. I will not accept that. I incorporated nothing in the sense of having read anything from anybody. It is not correct to say that I incorporated it. If you wish to pick out special words that I used and take an assignment of error to it you may.

I would like it to be clear on the record that I did not have open before me any assignments of error. They were all closed documents at the time I spoke. I mean I did not see those.

MR. BROWN. You mean instructions, not assignments of error.

THE COURT. I'm sorry. Instructions. I didn't read anything except where I obviously did.

MR. BROWN. My objections to the Charge as given are as follows: I object to the Court's advising the Jury that the Federal Trade Commission Order may be considered by them in the nature of a red flag, that the referral selling procedures were or might be or might constitute a fraudulent scheme.

THE COURT. I don't believe I said the latter but the record will speak for itself.

MR. BROWN. I object to the portion of the Court's Charge in which the Court suggested that as a preliminary question for the Jury with regard to the witness Zobel they should determine whether, when he was here, he entered into a common plan with New England Enterprises, referring to his visit of July 28th, and my objection is that that is an invitation to the Jury to engage in conjecture since there is no evidence before the jury as to any such agreement.

I further object to the Court's charging that in this case there is no obligation on the part of the Government to prove that anyone was defrauded.

What I am trying to point out—The Court has been on a different wavelength than myself—that in this case the charge was that the fraud did occur, and in this case, since it has been put in on the basis of completed transactions, which are claimed to have been fraudulent, I say that the obligation on the Government in this case is to prove that those people were actually defrauded.

We desire also to object to the Court's charge on Government's Exhibits 2–A, B and C where the Court attempted to point up the position of the Government and the defendants in that in that portion of the Charge, in our view, the Court over-emphasized the Government's position. Specifically, no mention was made of the earlier versions of the same documents from which they were drawn, which rather completely negates any sensible view that these were a fraudulent contrivance.

We desire to record any objection to the Court stating to the jury that the

witness Zobel didn't tell us what items were changed. My objection, may it please the Court, is that Zobel was here as a witness, subpoenaed by the Government. He answered all questions that were put to him and, I think, with some frankness and candor, and the Government did not inquire, and the Government has the burden and not us.

The Government has the burden to prove its case. We have no burden nor did the witness Zobel have any burden to come in and fill in the gap.

THE COURT. To the jury: Mr. Foreman and members of the Jury, in connection with Mr. Zobel's appearance, I made some remark about Mr. Zobel didn't tell us what particular changes he proposed should be made in the sales presentation of Interstate—of New England Enterprises Company.

I want to make it absolutely clear that Mr. Zobel was coming here as a Government witness. The Government has the burden of proving beyond a reasonable doubt every essential element of the crime. The witness, Mr. Zobel, wasn't free to volunteer what he knew. He could only respond to such questions as were put by the Government.

The Government asked him in general terms what he did when he was here. The Government did not ask him specifically what changes he suggested should be made in the program. The only evidence we have, so far as I recollect, but it is your recollection that governs, as to the specific changes suggested by Mr. Zobel, comes not from Mr. Zobel's mouth but comes from the mouth of Mr. McCadden and Mr. Lucht.

MR. BROWN. I also desire to record an objection to the Court's reply argument to Mr. Phinney's argument of there being no evidence of anything wrong after the 28th.

THE COURT. You mean there was evidence?

MR. BROWN. I prefer Mr. Phinney's argument on that situation to the Court's.

MR. PHINNEY. If the Court please, on behalf of Interstate Engineering I object to that portion of the Court's Charge which permitted the jury to consider whether there was a common purpose, whether they could determine that Mr. Zobel and representatives of New England Enterprises entered into a common plan or purpose with regard to reporting to the Postal Authorities.

That was in reference to what the Court referred to as Exhibit 43, and I think also it would include 48. It seems that in this area this would only be an invitation to speculation because there is no evidence of that nature, it seems to me.

And, secondly, with regard to your Honor's—Mr. Brown characterized it but I won't—my argument it seems to me in commenting on Mr. Zobel's conference and what happened after the 28th of July, 1965, the Court failed to state that portion of the evidence covering his going back to California and conferring with counsel.

THE COURT. I will be happy to do it. I had it in my notes and I deliberately skipped it because I thought you wouldn't want it but I am glad to do it.

MR. CALL. Fine.

THE COURT. To the jury: I have been asked by Interstate Engineering Corporation to instruct you with respect to that aspect of the testimony which related to Mr. Zobel's return to California and his conversations with Mr. Gute, his counsel.

It is up to you and not up to me to recollect what the evidence was. Anything I say with respect to my recollection of the evidence isn't binding on you, but I am going to give you some instructions on matter of law.

Obviously if Mr. Zobel went back and talked to his counsel and laid before his counsel all the relevant facts and then got an opinion from his counsel, and his counsel was acting, so far as Mr. Zobel knew, in good faith, it follows that the principles of immunity and

exculpation to which I previously referred govern.

Now I invite you to inquire as a matter of fact as to what evidence there is as to what was laid before Mr. Gute. Is there any evidence that there was laid before Mr. Gute Exhibits 2–A, B and C, or their other version, Exhibit E–117–A, B and C? Is there any evidence that Mr. Gute gave an opinion based upon the presentation actually made or believed by Mr. Zobel to have been actually made by Interstate Engineering Corporation? Did Mr. Gute at any time, I put the question to you, indicate that the California corporation, Interstate Engineering Corporation, was bound to continue after the expiration in March, 1966 of the contract between the California corporation and its franchise dealer to ship thereafter to the franchise dealer any vacuum cleaners?

MR. PHINNEY. Interstate desires to object to the illustration made by the Court with regard to the sugar distillery situation, insofar as it purports to be a statement of the law applicable.

THE COURT. To which I say *vide*— see American Law Institute Restatement. You know what I referred to evidently.

MR. PHINNEY. Yes.

THE COURT. Not Restatement but Code of Criminal Law.

MR. CALL. Your Honor, I believe at one time there was a statement by the Court to the Jury that the fact that if they were asked if you're selling anything, and the salesman said no, it was no longer an issue before the Jury.

THE COURT. I don't think I went that far. I'm content with what I excised from the Indictment.

MR. CALL. The next suggestion, your Honor, is could you give the last paragraph of our Requested Instruction No. 19?

THE COURT. I have got it. 19, the last paragraph?

MR. CALL. The last paragraph, your Honor.

THE COURT. To the jury: In determining whether or not a defendant or any other person was a member of a scheme to defraud, the jury are not to consider what others may have said or done. That is to say the membership of a defendant or any other person in a scheme to defraud must and can only be established by evidence as to his own conduct, what he himself said or did.

In other words, in considering whether or not a particular defendant was a member of a scheme to defraud you must do so without regard to and independent of the act or statements of any other people. You must determine the issue as to the scheme to defraud membership of a particular defendant only from any evidence as to his statements, conduct or acts.

MR. CALL. Your Honor, I would also like to take an exception to the illustration in the sugar case.

THE COURT. I thought it was already done by Mr. Phinney but I'm glad you think it's stronger by two.

MR. CALL. In that regard I would like to ask the Court to give Interstate's Requested Instruction No. 27.

THE COURT. I have covered the matter sufficiently to my satisfaction.

MR. CALL. Thank you, your Honor.

THE COURT. All right.

End of conference at the bench.

THE COURT. If the Jury is as hungry as everybody else they will be glad to know we have come to the end of the morning session and further sessions will depend upon the Jury. You are excused.

How are they being taken care of now?

THE CLERK. Ordinarily the Marshals are sworn.

THE COURT. All right. Wait a minute. You have got to stay here for the Marshals to be sworn. Just be seated for a minute.

Mr. Marshal, the deputies are coming in?

THE MARSHAL. Yes, your Honor.

THE COURT. All right.

MR. WALL. It might be appropriate, your Honor, to remind the jury not to let the Court know how they stand numerically should they have a question.

THE COURT. That's true enough.

THE CLERK. Marshals, please raise your right hand. Do you solemnly swear that you will take this jury to some convenient place and therein safely keep until they be agreed or discharged by the Court, that you will not speak to them yourselves nor suffer others to speak to them except by order of the Court or to ask them if they be agreed until they have returned their verdict into court, so help you God?

THE MARSHALS. I do.

THE COURT. Where are you taking them to lunch?

THE MARSHAL. To the Ambassador, sir.

THE COURT. All right. You'll get a good meal, I think. That's where counsel have been eating and the Court.

MR. CALL. Not any more. (Laughter)

THE COURT. Not today. The Court will take an indefinite recess.

MR. CALL. Your Honor, what is your desire about the availability of counsel?

THE COURT. You must be available the same as I must be from time to time. Don't get more than 10 minutes away from the building.

MR. CALL. Very well, your Honor.

THE COURT. Nobody expects you until 3:00 o'clock.

MR. BROWN. Mr. DeGrampre is covering for my office, and he will be in charge.

THE COURT. All right. I can't imagine that we will have a question from the Jury before 3:00 o'clock.

(Recess taken at 1:15 p. m.)

(The Jury returned to the courtroom at 9:45 p. m.)

THE COURT. Mr. Foreman and members of the Jury, this inquiry I am going to make of you is merely for the convenience of all parties, their counsel and, I hope, of yourselves.

You are entirely free to continue your deliberations if you want to this evening, if you think there is any likelihood, Mr. Foreman, in your own personal judgment that the Jury would return verdicts in another hour or so. I think it would be worthwhile to keep you here for another hour or so, and then to give each of you the option whether to stay at Government expense in the hotel which has arrangements for you or individually to go home.

On the other hand, if it is your best guess that you will not reach verdicts within an hour or so, I think it might be wise for you to stop now and resume in the morning, and to sleep together at the hotel where arrangements have been made.

Nobody wants to know how you stand, that is, whether you are evenly divided or overwhelmingly one way or another way. All I am trying to find out, Mr. Foreman, is your best judgment as to whether it is worthwhile to keep you deliberating for another hour or so this evening. What do you say?

THE FOREMAN. If your Honor please, I suggest that we stay for the evening.

THE COURT. All right. What does that mean, "stay for the evening"?

THE FOREMAN. All night.

THE COURT. You mean that you—

THE FOREMAN. I beg your pardon. I move that we withdraw to the motel.

THE COURT. Withdraw to the motel now?

THE FOREMAN. Yes.

THE COURT. All right. I will arrange for you to go to the motel now, and I am going to compromise by saying that at 9:30 tomorrow morning you will come back here to continue your de-

liberations. Between now and 9:30 put this case out of your mind as far as you can. At any rate, don't carry on any discussions with anybody else on the Jury or anywhere else with respect to this case until you come back into this building. I will expect you to come back into this building directly into the jury room. Is that the practice, or do they come into the courtroom?

THE CLERK. I would think the jury room.

THE COURT. Directly into the jury room at 9:30. The Marshal will make arrangements for you to be picked up and carried from your hotel here. You will be provided with breakfast tomorrow morning and, of course, if you have any legitimate needs of a medical or other nature don't hesitate to call upon the Marshals, who have you in custody, for any assistance. You are not allowed to call your home. You presumably have already informed your families that you might not be home tonight.

THE FOREMAN. If your Honor please, this is a technical question— should it be in writing?—regarding the Charge?

THE COURT. Oh, you better ask that by withdrawing now, writing out the question, making sure that your colleagues agree with the form of the question, and then return to the courtroom with the question, which will be handed to me by the Deputy Marshal, who is not to look at it but hand it directly to me.

THE FOREMAN. Do it now?

THE COURT. Do it now.

(The Jury leaves the courtroom.)

THE COURT. Was there something you had in mind?

MR. WALL. I was going to ask the Court if the jury could be asked before they retire whether they have decided as to anyone.

THE COURT. I am not going to ask them that at all. I have already given them instructions that they were free, if they wished, to come in, and it may be that they have a tentative but not a final agreement upon something. It is possible they haven't agreed upon anything finally or tentatively.

I think it is very important, and I may have something to say about this at a later stage, but I don't want anybody to misunderstand what I said in the Charge. I have not indicated with respect to the fundamental documents prepared by Interstate Engineering Corporation that there is not an omission which might be thought to be significant if a different case were presented on a different indictment.

I did not have any occasion to consider omissions except those which were covered by the Indictment. The only omission to which reference was made in the Indictment was in Paragraph 19 and in the over-all Paragraph 1.

If this case had been presented on the charge that the fundamental documents with respect to Interstate's arrangements were fraudulent or part of a fraudulent scheme because they omitted to state known facts as to the success already achieved or not achieved under this referral plan, I would have had a different case before me, but that question was not raised by the Indictment and was not ruled upon by me.

When I indicated that I agreed with Mr. Gute's interpretation of the documents of Interstate all that I meant to imply or state was that there were no positive misrepresentations in those documents, and that is all that was involved in this case before me. Whether there were omissions which were significant and which could have been made the basis of an indictment is a quite different case than the case that I tried.

Now the question is whether the exhibits ought to be returned by the Jury to the Clerk for overnight custody. In view of the uncertainty that we all must have with respect to this new building, I am going to have the Jury return the exhibits overnight to the Clerk for the Clerk to keep in her custody unless there is some objection. There is no objection.

There is no restraint upon the defendants overnight. They may go whereever they usually go but they must be here tomorrow morning at 9:30 a. m.

(The Jury returned to the courtroom at 10:00 p. m.)

THE COURT. I have a question, which is really quite simple to answer, and I don't think I will have to take long about it. The note from the Foreman reads as follows:

"Your Honor, please. Regarding Count 32 the Jury find no evidence. Should this count be excluded by the Court or should the Jury disregard the count? Neither Mr. or Mrs. White testified."

This is signed by Mr. Garrett, the Foreman.

I already directed the acquittal of all the defendants on Counts 19 and 32, so you need not worry about Count 32 any more. I also directed an acquittal of all the defendants, as I indicated, on Count 19, so you should not consider that count. The only counts which survive are Counts 1, 23, 27 and 35.

With respect to none of these counts is National Budget Corporation any longer before you because I directed an acquittal with respect to National Budget Corporation on all counts. With respect to Interstate Engineering Corporation, the California corporation, I have directed an acquittal on Counts 1, 23 and 27 as well as on Counts 19 and 32, so that with respect to Interstate Engineering Corporation only Count 35 survives.

With respect to the five individual defendants, and with respect to New England Enterprises, Inc., you will be required to render verdicts on Counts 1, 23, 27 and 35.

Does that make it clear?

THE FOREMAN. Thank you, your Honor. There is a disagreement on recollection.

THE COURT. Now, Mr. Foreman and members of the Jury, I hope that you have a good night's sleep and a good breakfast, and at 9:30 tomorrow morning you will continue your deliberations in the jury room. The defendants will be available and their counsel will be available on 10-minute call, and the Judge will be available.

(Whereupon the trial was recessed to Friday July 21, 1967, at 9:30 a. m.)